**Pablo MALDONADO–PEREZ, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 88–1164.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 8, 1988.

Decided Jan. 10, 1989.

As Amended Jan. 17, 1989.

William Van Wyke, Washington, D.C., for petitioner.

Marshall Tamor Golding, Atty., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., and Joan E. Smiley, Asst. Director, Dept. of Justice, Washington, D.C., were on the brief, for respondent. Mark C. Walters, Atty., Dept. of Justice, Washington, D.C., also entered an appearance, for respondent.

Before WALD, Chief Judge, STARR and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Separate dissenting opinion filed by Chief Judge WALD.

SENTELLE, Circuit Judge:

We address whether an immigration judge may deport *in absentia* an alien seeking political asylum who has more than two months notice of the date and location of his deportation hearing, but who claims that he had reasonable cause for his absence, and had twice moved for a change of venue. We conclude that the Immigration Court did not abuse its discretion or violate petitioner's constitutional or statutory due process rights by denying his motions for change of venue or by ordering his deportation, and we affirm the Board of Immigration Appeals' decision upholding the Immigration Court.

## I. FACTUAL BACKGROUND

Petitioner, Pablo Maldonado–Perez, is an El Salvadoran peasant farmer who lived in an area of El Salvador controlled by the opposition FMLN. He fled El Salvador allegedly fearing persecution by non-governmental but government-supported anti-FMLN forces. He illegally entered the United States "without inspection" near Brownsville, Texas, on April 4, 1986. The following day, April 5, 1986, he was ap-

prehended by the Immigration and Naturalization Service ("INS") and, on the same day, was "ordered to show cause" for his entry into the United States "without inspection."

His first attorney, Patrick M. Hughes from Refugee Legal Services ("local counsel"), who remained petitioner's attorney of record throughout these proceedings, conceded deportability by stipulation at an initial hearing on April 22, 1986. Local counsel argued that petitioner's deportation should be withheld, alleging that petitioner was a political refugee under subsection 201(a)(42) of the Refugee Act of 1980 [1] and therefore qualified for political asylum. [2]

On July 1, 1986, the Immigration Court of Judge Bernado Maldonado notified local counsel that an evidentiary hearing regarding the withholding of petitioner's deportation and his political asylum claim ("deportation hearing") was scheduled for September 29, 1987, in San Antonio, Texas. However, on December 19, 1986, the Immigration Court notified local counsel that the deportation hearing was re-scheduled for February 17, 1987. Although the hearing date was accelerated seven months, there is no dispute that local counsel was notified two months before the new hearing date.

Sometime after petitioner was released on bond, he moved on his own accord to Washington, D.C. After petitioner's move, local counsel on December 29, 1986, filed a motion for change of venue ("Motion 1")

from San Antonio to Washington. Petitioner argued that Washington was the most convenient venue for him, since he was indigent and his witnesses, who were never identified, lived in Washington. He also argued that he had no ties to San Antonio, contending that proper venue should have been Harlington, Texas, the INS district where he entered into the United States. [3]

The INS opposed Motion 1 because it would cause undue delay; it would add to the backlog of asylum cases already pending in Washington; the petitioner's departure from the venue was by his own choice; and his local counsel was located in nearby Laredo.

On January 7, 1987, the Immigration Court denied Motion 1. Appendix ("A.") at 16. Local counsel was properly notified. The date for the hearing remained unchanged.

Sometime between January 7 and February 17, Refugee Legal Services contacted William Van Wyck, an attorney in Washington, to represent petitioner since its office was overburdened with work. Van Wyck ("Washington counsel") agreed to represent petitioner. Although the exact date that petitioner retained Washington counsel is uncertain, notations in the INS Trial Attorney Work Sheet reference Van Wyck as petitioner's counsel at least one week before the hearing.

---

**1.** Refugee Act of 1980, Pub.L. No. 96–212, § 201(a), 94 Stat. 102 (codified as amended at 8 U.S.C. § 1101(a)(42)(A) (1982)). The Refugee Act defines a political refugee as, *inter alia,* any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country *because of persecution or a well-founded fear of persecution on account of* race, religion, nationality, membership in a particular social group, or *political opinion....*
*Id.* (emphasis added).

**2.** The subsection on asylum procedures states that
   [t]he Attorney General shall establish a procedure for an alien physically present in the

United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of [8 U.S.C. § 1101(a)(42)(A)].
Refugee Act, § 201(b), 8 U.S.C. § 1158(a).

**3.** The INS contended venue was proper from the beginning because petitioner was apprehended in the San Antonio INS district near Hebbronville, Texas. *See* Brief for Respondent at 9 n. 10. The INS contends that venue is proper where an alien is apprehended, regardless of where he enters into the United States. Since petitioner sought venue in Washington, not where he alleged that venue was proper, we do not need to decide this issue nor do we weigh it in our decision.

Before the hearing, Washington counsel contacted the INS attorney twice by telephone. He apparently tried to obtain INS support for a change of venue since both he and petitioner were located in Washington. Whether the INS counsel agreed to Van Wyck's proposed change of venue is uncertain. Washington counsel also discussed with the INS attorney a motion for continuance, but Washington counsel never filed such a motion.

Washington counsel express mailed his change of venue motion ("Motion 2") to the Immigration Court. Motion 2 arrived February 17, 1987, at 9:33 a.m., only twelve minutes before the hearing was scheduled to begin. Neither Washington counsel nor petitioner was present at the deportation hearing, apparently assuming that the Immigration Court would grant Motion 2.[4] Although Washington counsel attempted to contact the Immigration Court by telephone, he failed in his attempt. Since local counsel remained attorney of record throughout the proceedings,[5] it was not until the hearing that the Immigration Court became aware that petitioner had Washington counsel.

After recessing all morning to allow petitioner an opportunity to appear or explain his absence, the Immigration Court denied Motion 2 at 2:40 p.m., concluding that there was no reason for further delay. The court stated that under local court practice motions like this must be submitted at least five days in advance of hearing to give the INS appropriate time to respond. The court emphasized the basis for the rule by noting that this was an "eleventh hour" motion, repeating a motion which had been properly denied on January 7, over a month and one half earlier.[6] Furthermore, although local counsel was out of the country, the court noted on the record that local counsel had not withdrawn from the case and that he had an associate who could have attended on his behalf.[7] Based on these factors, the Immigration Court denied Motion 2.

Since the Immigration Court denied Motion 2, it continued with the deportation hearing as scheduled. The court ordered the petitioner deported *in absentia* based upon the "record as constituted" which included petitioner's earlier stipulation that he was an El Salvadoran. Tr. at 3 (A. at 24).

Petitioner appealed to the Board of Immigration Appeals of the Department of Justice ("BIA"). The BIA affirmed,[8] noting that section 242(b) of the Immigration and Nationality Act, which describes the procedures for deportation of aliens including those alleging refugee status, permits an *in absentia* determination if the alien has had a "reasonable opportunity to be present."[9] The BIA also stated that,

---

4. Apparently petitioner assumed that, since new counsel resided in Washington, the Immigration Court would consider this enough to grant change of venue. The Immigration Court had considered the proximity of local counsel as one factor in denying Motion 1.

5. Mr. Van Wyck did not submit with Motion 2 or at any other relevant time the appropriate Form G-28 naming him attorney of record. *See* 8 C.F.R. § 299.1 (1987) (G-28 (10-25-79)—Notice of Entry of Appearance as Attorney or Representative).

6. Transcript of Hearing ("Tr. at 2") (A. at 23). *See also In re Pablo Maldonado-Perez,* Dept. of Justice, Exec. Off. for Imm. R., Order of the Imm. Judge, Change of Venue, File A26-411-174 (San Antonio, Tx., February 17, 1987) (A. at 25).

7. Tr. at 3 (A. at 24).

8. *In re Pablo Maldonado-Perez,* Dec. of the Bd. of Imm. App., Dept. of Justice, File A26-411-174 (San Antonio, Tx., November 10, 1987) (A. at 27.1) ("BIA Decision").

9. Section 242(b) of the Immigration and Nationality Act, Pub.L. No. 414, § 242(b), 66 Stat. 163, 209-10 (1952) (codified as amended at 8 U.S.C. § 1252(b)), provides in pertinent part that

[a] special inquiry officer [immigration judge] shall conduct proceedings under this section to determine the deportability of any alien, and shall administer oaths, present and receive evidence, interrogate, examine, and cross-examine the alien or witnesses, and, as authorized by the Attorney General, shall make determinations, including orders of deportation. Determination of deportability in any case shall be made only upon a record made in a proceeding before a special inquiry officer, at which the alien shall have *a reasonable opportunity to be present,* unless by reason of the alien's mental incompetency it is impracticable for him to be present, in which case the Attorney General shall prescribe nec-

"[o]ther than the implied inconvenience, the [petitioner] ha[d] not shown how he was harmed by the immigration judge's venue ruling. He ha[d] not named any witnesses he would have presented or any evidence he could have obtained only if the hearing had been held in Washington, D.C." BIA Decision at 3 (A. at 28).[10]

Petitioner appeals the BIA decision to this Court. We affirm the BIA on the same grounds as it affirmed the Immigration Court: Petitioner was given a reasonable opportunity to be heard under the Refugee Act and chose not to appear, incorrectly assuming that an untimely change of venue motion would serve as a reasonable cause for absence.

## II. LEGAL BACKGROUND

■ To avoid deportation, an alien who has unlawfully entered the United States has a Fifth Amendment procedural due process right to petition the government for political asylum, *Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1036 (5th Cir.1982), and a statutory procedural due process right for political asylum under subsection 201(b) of the Refugee Act, 8 U.S.C. § 1158(a),[11] and subsection 242(b) of the Immigration and Nationality Act, 8 U.S.C. § 1252(b).[12] There is no constitutional right to political asylum itself. *Haitian Refugee Center*, 676 F.2d at 1039.

Thus, our inquiry begins with a question: what process is due under both the Constitution and statute to an alien who petitions for political asylum? The Supreme Court has established the minimum requirements for constitutional procedural due process as some form of meaningful or fair hearing. *See, e.g., Logan v. Zimmerman Brush*

*Co.*, 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982); *Board of Regents v. Roth*, 408 U.S. 564, 570–71 n. 8, 92 S.Ct. 2701, 2705 n. 8, 33 L.Ed.2d 548 (1972). Likewise, Congress set the minimum requirements for statutory due process in subsection 242(b) of the Immigration and Nationality Act, 8 U.S.C. § 1252(b), directing that a "special inquiry officer" (immigration judge) conduct a proceeding with all the procedural methods to gather evidence insuring that the alien "have [a] reasonable opportunity to be present." *Id.*

Since the statutory requirement for procedural due process appears to meet the minimum constitutional requirement, the statutory requirement is sufficient procedural due process for a deportation hearing. Thus, an alien unlawfully within the United States seeking political asylum as a refugee must be afforded an evidentiary hearing pursuant to subsection 242(b) (8 U.S.C. § 1252(b)) with a reasonable opportunity to present his argument that, based upon his "political opinion," he was actually persecuted in his country of nationality or country of "last habitual[ ] reside[nce]" or he has a "well-founded fear of persecution" if returned to such country. 8 U.S.C. § 1101(a)(42)(A) (1982).

It is well established, however, that this evidentiary or deportation hearing is a purely civil proceeding, and the alien is not entitled to all the constitutional safeguards of criminal defendants. *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984); *Patel v. INS*, 803 F.2d 804, 806 (5th Cir.1986); *Cabral–Avila v. INS*, 589 F.2d 957, 959 (9th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1245, 59 L.Ed.2d 472 (1979). For instance, aliens do not have a Sixth Amend-

essary and proper safeguards for the rights and privileges of such alien. *If any alien has been given a reasonable opportunity to be present* at a proceeding under this section, and *without reasonable cause fails or refuses to attend* or remain in attendance at such proceeding, *the special inquiry officer may proceed to a determination in like manner as if the alien were present.* *Id.* (emphasis added).

**10.** The BIA also responded to petitioner's contention that he should not be returned to a

"country at war." The BIA dismissed this issue, holding that general conditions of violence and upheaval in a country are insufficient, by themselves, to warrant a grant of asylum withholding of deportation. BIA Decision at 4 (A. at 29). Since the petitioner does not raise that issue here, we have no occasion to express our opinion on this matter.

**11.** *See supra* n. 2.

**12.** *See supra* n. 9.

ment right to counsel at deportation hearings, *Baires v. INS*, 856 F.2d 89, 90 (9th Cir.1988),[13] although aliens do have a statutory right to counsel but not at government expense. *Castro–O'Ryan v. Dep't. of Imm. & Nat.*, 847 F.2d 1307, 1312 (9th Cir.1988).[14]

Another example of a diminished constitutional safeguard in a deportation hearing, and most significant to the present case, is that an immigration judge may deport an alien *in absentia* based on the existing record. 8 U.S.C. § 1252(b). Regarding deportation hearings when both alien and counsel are *in absentia*, Justice O'Connor recently wrote:

> Consistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing. The [alien] must be given "a reasonable opportunity to be present at [the] proceeding," but if the [alien] fails to avail himself of that opportunity the hearing may proceed in his absence.

*Lopez–Mendoza*, 468 U.S. at 1038–39, 104 S.Ct. at 3483 (citing 8 U.S.C. § 1252(b)). *See also Patel*, 803 F.2d at 806 ("[t]he fact that [a deportation] hearing [is] held *in absentia* is not *per se* violative of due process"); *Shah v. INS*, 788 F.2d 970, 972 (4th Cir.1986) (when alien fails to appear at a deportation proceeding after afforded a reasonable opportunity to appear, immigration judge may deport the alien *in absentia*); *United States v. Dekermenjian*, 508 F.2d 812, 814 (9th Cir.1974) ("[w]hen one voluntarily chooses not to attend a deportation hearing which may affect him adversely, he is hardly in a position to complain that an Order made pursuant to the hearing is invalid because of his absence").

■ In summary, minimal procedural due process in this context requires only a meaningful or fair evidentiary hearing with a reasonable opportunity to be present. An *in absentia* deportation is legitimate if the alien had a reasonable opportunity to be present and failed to provide reasonable cause for his absence.

## III. ANALYSIS

Our task then is to determine whether petitioner had a reasonable opportunity to be present at his February 17 hearing and, if so, whether petitioner had a reasonable cause for his absence from the hearing.

### a. *Reasonable Opportunity to Be Present.*

Petitioner clearly had a reasonable opportunity to be present at his hearing. He had a full two months notice of the date of the hearing—counsel was notified on December 19 that the hearing would be on February 17. He chose on his own accord to move to Washington, D.C. Although an indigent, the petitioner was resourceful enough to travel to Washington from San Antonio. He does not explain why he could not use those same talents to return to San Antonio. If nothing else, the petitioner could have surrendered himself to his bond, and the INS would have had to transport him to San Antonio. As the Immigration Court noted, petitioner's counsel of record remained Mr. Hughes, whose office was in Laredo. The record as before this Court shows that petitioner potentially had three attorneys: local counsel; an associate of local counsel; and Washington counsel. We are perplexed why one of these three attorneys could not appear at the hearing.

Petitioner blames the INS, contending that there was some form of agreement between the INS attorney and petitioner's counsel over Motion 2 and a continuance. Although there is nothing in the record that supports this claim other than petitioner's allegations,[15] assuming *arguendo* that

---

**13.** *See also Ramirez v. INS*, 550 F.2d 560, 563 (9th Cir.1977).

**14.** See also § 242(b)(2) of the Immigration and Nationality Act, which reads:

> the alien shall have the privilege of being represented (at no expense to the Govern-

ment) by such counsel, authorized to practice in such proceedings, as he shall choose.

8 U.S.C. § 1252(b)(2).

**15.** In fact the record shows otherwise. INS counsel's notes of the telephone conversation with Van Wyck show that the INS never agreed to join any motion. The INS only agreed to

the record did provide evidence of an agreement, only a trial judge or in this case an immigration judge may grant such a motion. Since denying Motion 2 was not an abuse of discretion as discussed below, the Immigration Court could have denied Motion 2 even if the INS attorney fully supported the Motion.

Petitioner also contends that his new Washington counsel did not have "reasonable opportunity to be present," thereby denying petitioner his "reasonable opportunity to be present" since he was uneducated in American legal proceedings. As we have previously mentioned, there were two local attorneys available to represent petitioner, one of whom was counsel of record. Furthermore, the record provides evidence that petitioner had obtained Washington counsel at least one week before the hearing. Although one week is not ideal, one week is certainly more than enough time to travel to San Antonio to be present for the hearing.

To support his argument that he had no reasonable opportunity to be present, petitioner relies on a recent Ninth Circuit decision, *Baires v. INS*, 856 F.2d 89 (9th Cir. 1988). In *Baires*, the Ninth Circuit concluded that an immigration judge had abused his discretion in denying an alien's motions for a change of venue and continuance after the alien had moved from Florence, Arizona, to San Francisco. Petitioner's reliance on *Baires* is unfounded as this case is easily distinguishable and applies to a very narrow set of facts. In particular, Baires, an El Salvadoran seeking political asylum as a refugee, returned to Florence for his hearing after the immigration judge had telephonically denied his motions for a continuance and change of venue five days before. Baires's San Francisco counsel arranged for another attorney to appear with Baires at the hearing, who made the two motions again, explaining to the immigration judge that Baires had three *named* witnesses in San Francisco, including an expert witness, who could not at the time travel to Florence for the hearing. The immigration judge denied the two motions

assist Van Wyck in insuring that Motion 2 was

again, contending that the motion made five days before was untimely because he did not have adequate time to re-schedule his court for other purposes. The immigration judge further stated that he would accept the witnesses' testimony in written form but, nonetheless, deported Baires at the close of the hearing that day without the testimony.

There are at least three critical distinctions between *Baires* and this case, any one of which would be sufficient to distinguish *Baires*. First, Baires had three *named* witnesses who resided in the San Francisco area, giving legitimate credence to his claim that his case would best be heard in San Francisco. Petitioner alleged in Motion 2 that he had witnesses in Washington but never identified them, much less describing the nature of their testimony. Second, Baires presented his motion five days before the hearing, whereas here Motion 2 was denied as untimely since it arrived only twelve minutes before the hearing. In the present case, the Immigration Court actually stated in the record that it had a policy that motions be submitted five days before hearing. Third, and most importantly, in *Baires* both the alien and counsel appeared at the hearing despite Baires's indigence and despite the fact that he had only 48 days notice of his hearing. Here, petitioner had 60 days notice of his hearing, and still did not appear, either personally or through counsel.

We find the recent Fifth Circuit decision in *Patel v. INS*, 803 F.2d 804 (5th Cir.1986), much more similar to the facts before us. In *Patel*, the Fifth Circuit upheld an immigration judge's denial of a continuance and deportation *in absentia* of a native of India who had exceeded two authorized stay periods. Similar to these facts, Patel had two attorneys. The first counsel apparently had scheduling conflicts. Patel obtained replacement counsel approximately one week before the hearing. Second counsel requested a continuance which the immigration judge denied. While the decision does not state whether the motion was denied before or during the hearing, nei-

*presented* to the Immigration Court.

ther Patel nor his counsel appeared for the hearing. The immigration judge proceeded *in absentia*, reviewed the available record, and ordered Patel deported. *Id.* at 805–06.

The Fifth Circuit upheld both the denial of the continuance and the deportation, emphasizing that "[Patel] and his first attorney received notice of the hearing the month before the scheduled date [and, h]is second attorney became apprised of the hearing date no later than a week before the hearing." *Id.* at 806. Here petitioner and his first attorney received notice *two* months before the hearing, and his second attorney also had a week's notice of the hearing. Furthermore, we agree with the Fifth Circuit's conclusion that a "mere submission of a motion for continuance does not relieve an alien or his counsel of the obligation to appear for a noticed hearing." *Id.* at 806. The same holds true with a motion for change of venue.

■ An immigration judge simply cannot be responsible for ensuring the presence of an alien or his counsel at a deportation hearing when the alien has a reasonable opportunity to be present. Nonetheless, the Immigration Court in the present case delayed action on the hearing until the afternoon, hoping that someone would call and explain the petitioner's absence. It seems reasonable to assume that an alien or his counsel would have at least attempted to learn the outcome of a morning deportation hearing early in the afternoon. With the crowded docket of immigration courts, we cannot require the BIA to permit an alien to move from venue to venue and disregard a long scheduled deportation hearing. We agree with the Immigration Court and the BIA that petitioner had a reasonable opportunity to be present.

b. *Reasonable Cause for Absence and Change of Venue.*

Since we conclude that petitioner had a reasonable opportunity to be present, we must now address whether he had reasonable cause to be absent. Petitioner's argument for his absence is intertwined with his argument for a change of venue. We have already stated that mere submission of a motion for change of venue does not provide reasonable cause for absence of an alien or his counsel. Nonetheless, we will address each of petitioner's arguments for change of venue.

Under the INS regulations promulgated pursuant to the Immigration and Nationality Act, it is within the sound discretion of the immigration judge to grant a change of venue motion upon a showing of "good cause." 8 C.F.R. § 3.19(b) (1988) (effective March 2, 1987).[16] *See also Baires,* 856 F.2d at 92; *Patel,* 803 F.2d at 806.

Thus, we must determine whether the Immigration Court abused its discretion by denying Motions 1 and 2. The Immigration Court denied Motion 1 based on the arguments submitted by the INS:[17] The change of venue would cause undue delay since the case was scheduled to be heard on the merits; petitioner had local counsel in Laredo (Washington counsel had not been obtained at this time); petitioner failed to identify any witnesses in the Washington area; and petitioner moved to Washington on his own accord while the case had from inception been within Texas, principally in the San Antonio INS District.[18]

**16.** Petitioner contends that, since the "good cause" regulation was promulgated on January 29, 1987, after Motion 1, and did not take effect until March 2, 1987, after Motion 2, the regulation is inapplicable. However, by petitioner's own admission, the regulation was nothing more than a codification of prior practice based on the BIA rule that venue may be changed at *the discretion of the Immigration Court.* Brief for Petitioner at 30. We find that the change in the source of the "good cause" rule is immaterial for purposes of these facts since the Immigration Court did not abuse its discretion. We also note that *Baires,* upon which petitioner relies, applied the 1987 CFR version of "good cause" to a 1985 denial for change of venue. *Baires,* 856 F.2d at 92.

**17.** *See In re Pablo Maldonado–Perez,* Dept. of Justice, Exec. Off. for Imm. R., Order of the Imm. Judge, Change of Venue, File A–26–411–174 (San Antonio, Tx., January 7, 1987) (A. at 16).

**18.** Memorandum from INS District Counsel, San Antonio, Tx., to Imm. Judge, San Antonio, Tx. (December 31, 1986) (A. at 15).

The Immigration Court denied Motion 2 because of its "eleventh hour" nature and because petitioner did not present any new arguments. Although Washington counsel signed Motion 2, he never submitted the appropriate change of counsel Form G–28.[19] Moreover, Motion 2 never stated that Washington counsel had replaced local counsel. It merely stated that Washington counsel would serve as counsel "to protect [petitioner's] interest in the Arlington/Baltimore jurisdiction." [20]

■ We simply cannot find that denying either Motion 1 or Motion 2 for the stated reasons constituted an abuse of discretion. When we review petitioner's reasons for a change of venue, we are not convinced that any constitute "good cause," especially in light of the deference we must give to the Immigration Court.

We summarize petitioner's arguments for a change of venue to Washington into nine points. One, petitioner sought political asylum from an "extremely repressive country" and therefore was due some special considerations. Two, he was illiterate and uneducated so he was less capable of making arrangements for travel. Three, San Antonio was inconvenient because he was indigent and his witnesses lived in Washington. Four, he attempted to get assistance from a legal aid office but the office was overburdened. Five, he was free on bond so he could travel where he liked and the INS could take him into custody if he did not appear. Six, an agreement existed between petitioner's Washington counsel and the INS. Seven, his Washington counsel discussed a continuance with the INS counsel. Eight, his local counsel was out of the country on the date of the hearing and had so informed the INS counsel. And, nine, petitioner contends that commentators on immigration law suggest that venue for a deportation hearing is customarily at or near the alien's area of residence.

■ Petitioner's first reason, whether a regime is repressive, is a matter for the merits of the evidentiary hearing and is not germane to venue. If a regime is repressive, it will be repressive whether the hearing is in San Antonio or Washington.

We have already addressed petitioner's second and third reasons, *i.e.*, that San Antonio was inconvenient because of his lack of education and indigence and because his witnesses lived in Washington. If he was capable of traveling from San Antonio to Washington, it is reasonable to conclude that he is capable of returning, especially when he had two months notice. He never identified any witnesses, so we can only speculate on their existence.

As for his fourth reason, that he attempted to get assistance from a legal aid office but the office was overburdened, we note that he did in fact have assistance from a legal aid office for several months and obtained additional experienced immigration law counsel one week before his hearing date. As *Patel* suggests, one week should be sufficient time for an experienced immigration attorney to prepare a colorable argument against deportation. *Cf. Patel*, 803 F.2d at 806–07 (upholding district court's finding that one week's preparation was adequate time for a deportation hearing when there is experienced immigration counsel and the case lacks complexity).

■ Petitioner contends that, since he was free on bond, he could travel where he liked and the INS could take him into custody if he failed to appear. Petitioner is essentially arguing that, if he is free on bond, he does not need to appear at his hearing. The INS has the responsibility to *find* him and bring him to the hearing. We cannot accept this logic. Under petitioner's argument, anyone free on bail would not have to appear at a hearing or trial until the law enforcement agency prosecuting him took him back into custody. As we suggested earlier, the petitioner had a reasonable opportunity to appear at his hearing simply by surrendering to his bail.

Petitioner also argues that, because there was an agreement between counsel

---

**19.** *See supra* n. 5.

**20.** Motion 2, para. 5 (A. at 18).

to change venue, he was relieved of the obligation to make the motion. Petitioner adds that his counsel actually wanted a continuance. As we previously noted, the record does not support petitioner's assertion that an agreement to change venue existed. Nonetheless, only the Immigration Court can grant the motion, regardless of an agreement between counsel. If petitioner wanted a continuance, petitioner should have moved for a continuance. This Court certainly cannot review a denial of a motion for continuance when no motion is made in the first place.

■ Petitioner's eighth reason is that local counsel was out of the country, and the INS was aware of this. If counsel knowingly does not appear at a hearing of which he has sufficient notice, neither opposing counsel nor the immigration judge are at fault for acting without him. Counsel is responsible for his own replacement.

Finally petitioner argues that venue for a deportation hearing is customarily at or near the alien's area of residence. Brief for Petitioner at 31 (citing 1A C. Gordon & H. Rosenfield, *Immigration L. & P.* § 5.6c (rev. ed. 1988)). While this may be the custom, it hardly is an established rule of law. We recognize that the Supreme Court recently cited this section of the treatise favorably in *Landon v. Plasencia*, 459 U.S. 21, 25, 103 S.Ct. 321, 325, 74 L.Ed.2d 21 (1982). But Justice O'Connor, for the Court, was merely distinguishing customary venue of an exclusion hearing from that of a deportation hearing. We note that, since *Landon*, Justice O'Connor wrote *Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, where she clearly stated that deportation hearings do not have the constitutional status of a criminal proceeding.

■ Although there may be times when some of petitioner's reasons for a change of venue constitute "good cause," we are not convinced that the Immigration Court abused its discretion in finding otherwise in this case. Because the Immigration Court did not abuse its discretion, we must hold that petitioner did not provide a "reasonable cause for absence" from his deportation hearing. As *Patel* suggests, the mere making of a motion for change of venue does not create a reasonable cause for absence by an alien or his counsel from the alien's deportation hearing. *See Patel*, 803 F.2d at 806.

### IV. SUMMARY

For the above stated reasons, we affirm the BIA's decision upholding the Immigration Court. We conclude that petitioner was provided a reasonable opportunity to be present at his deportation hearing but did not provide a reasonable cause for his absence. Accordingly, the Immigration Court did not abuse its discretion in denying both of petitioner's motions for change of venue.

AFFIRMED.

WALD, Chief Judge, dissenting:

I dissent on the grounds that in the circumstances of this case, Maldonado–Perez was not afforded a "reasonable opportunity" to present his case for asylum to the immigration judge, and that it was an abuse of discretion to simultaneously deny him a change of venue and a continuance, and to order his deportation *in absentia.*

First, it is of pivotal significance that Maldonado–Perez's claim for asylum is not a frivolous one. He came to this country to escape persecution. A subsistence farmer from an area in El Salvador controlled by the forces opposing the government, he alleges that simply living in such an area poses a threat to his life from the military because residents are indiscriminately believed by the government to be supporters of the opposition. This type of danger has indeed been verified by factual findings of a federal district court. *Orantes–Hernandez v. Meese*, 685 F.Supp. 1488, 1493 (C.D. Cal.1988) ("Salvadoran civilians in the countryside are subjected to repeated bombing attacks and ground sweeps by the military [which] in many cases are brought about because the government has imputed political opinion to the victims based solely on their residence."). Additionally, I note the total absence of any evidence in this record suggesting that Maldonado–Perez has as-

serted his claim of asylum solely to delay his deportation or remain in the United States illegally; indeed, he conceded his deportability (thus allowing summary deportation proceedings) almost as soon as he was apprehended.

The second fact of importance is that Maldonado–Perez's move to Washington at some time soon after his release from custody on bond in July 1986, was an entirely lawful one. There were no conditions on this release, and there are no regulations prohibiting travel. Pending his deportation proceeding, he was a registered alien, legally in this country. Indeed, he was among a special class of aliens who are *entitled* to work authorization. 8 C.F.R. § 274a.12(c)(8); 8 C.F.R. § 274a.13(a). At the time of his release, his scheduled hearing date in San Antonio was some *fifteen months* away; he had been apprehended within a day of entering the United States in Texas and had no prior residence or connections in Texas. It was necessary, and he was entitled, to go somewhere where he could find work or support from friends and relatives. In opposing his later motions for change of venue to Washington, the INS cited concerns about burdens on the Washington docket and delay in the proceedings. But it cannot be that such concerns require a *fifteen-month* restraint on a penniless alien's mobility to look for the means of survival. In short, Maldonado–Perez had a legal right to move to Washington and for that move to be given due consideration when his motion for change of venue was subsequently made.

Of course, the INS has a legitimate interest in preventing aliens from using their right to travel to delay or obstruct deportation and asylum proceedings. But there is absolutely no evidence on this record that this petitioner had any such motive; the

implications in the majority opinion that petitioner "move[d] from venue to venue" are not borne out in any way by the record. Here, there was no pattern of packing up and moving just prior to a hearing date or dates; no abandonment of a long-time residence; no suggestion that the Washington residence is a sham. Other courts have been more sensitive to the demands of survival on these unfortunate refugees. *Cf. Baires v. INS*, 856 F.2d 89, 93 (9th Cir. 1988) (move from Arizona to San Francisco one month prior to date set for hearing in Arizona not unreasonable for alien bonded out by custody).

Given the clear legitimacy of Maldonado–Perez's move to Washington, it is in my mind a close case as to whether his *original* motion for change of venue was correctly denied. Washington, D.C. is, after all, 1700 miles away from San Antonio, Texas. At that point, however, he had no Washington counsel and his original counsel was still in Texas; consequently, the judge's denial may have been justifiably aimed at avoiding a state of limbo in which proceedings could not go forward at either end. But when the second motion for venue change was submitted, and it became clear that not only Maldonado–Perez's residence but his counsel as well were in Washington, I believe the government's administrative interests should not have trumped the petitioner's statutory interests in a hearing on his asylum claim. To insist that Maldonado–Perez and his new counsel travel this distance—*round trip*—for a hearing which could equally well be had in Washington [1] seems unnecessarily rigid in view of petitioner's plight, to a point of depriving him of due process. [2] Petitioner is clearly indigent, an "illiterate peasant who signs his name with an X," Brief for Petitioner at 6, fleeing from a country plagued

---

1. Petitioner had conceded deportability; there would have been no need for witnesses such as the INS personnel who had apprehended petitioner. The only issue in the hearing would have been petitioner's claim to asylum, which would have turned principally on his own showing.

2. The Supreme Court has stated, "There are literally millions of aliens within the jurisdic-

tion of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty or property without due process of law. [ ] Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976).

by poverty and war. The suggestion that, "well, if he could make it to Washington in the first place, he can make it back again," has no basis in fact or fairness. *See* Brief for Respondent at 9; Majority opinion ("Maj. op.") at 333; Maj. op. at 337. We do not know how he made that first journey in search of a place to live and work. He may have hitchhiked, hopped on freight cars, or spent the remaining money he brought with him from El Salvador. The fact is that he now resides in Washington and he has no means to get back to Texas. The whole nature of venue is to afford litigants a convenient forum. Washington was clearly the convenient forum in this case, and no valid reason appears on the record why his request for a change should not have been granted in a case so important to his future.

These key circumstances lead me to make two points. The first is that the statute itself requires that an alien be given a "reasonable opportunity" to attend his deportation hearing, and that a hearing be held *in absentia* only if his absence is without "reasonable cause." 8 U.S.C.A. § 1252(b) (1988). The immigration judge and majority have reduced that statutory right to mean only that the alien be given reasonable *notice* of the date and place of the hearing. The legislative history clearly shows, however, that Congress intended "opportunity" to mean more than mere "notice." [3]

In explaining the "reasonable opportunity" and "reasonable cause" provisions, Congress indicated that the extreme of an *in absentia* proceeding was intended only as an *extraordinary*, punitive, measure when failure of the petitioner to attend amounted to "obstruction of justice":

> The bill provides that if any alien has been given a reasonable opportunity to be present at his deportation proceeding and without reasonable cause fails to attend or remain in attendance at the proceeding, the [immigration judge] may proceed to determine the case in like

manner as if the alien were present. The committee feels that this provision is of the utmost importance from the standpoint of the best interest of the Government. [Immigration judges] have no authority to punish aliens who fail to appear or remain at deportation hearings, through contempt proceedings or otherwise. Orderly administrative processes have at times been interrupted and subjected to unnecessary delays because aliens, without legitimate cause, refused to attend scheduled hearings or insisted upon leaving at their own pleasure and without other than *contumacious* reasons. The Government should have authority to proceed to a final decision in the face of such *obstructionist tactics.*

H.R.Rep. No. 1365, 82d Cong., 2d Sess. 57 (1952), U.S.Code Cong. & Admin.News, 1952, pp. 1653, 1712–1713 (emphasis added). Thus, the authorization for *in absentia* hearings was directed at those aliens who flouted all "reasonable opportunity" afforded them to attend the hearings. It should not be read to defeat the otherwise strict requirement of the Act that "the determination of deportability in any case must be made solely upon the record made in the proceedings ... at which the alien shall have had reasonable opportunity to be present." *Id.,* U.S.Code Cong. & Admin. News 1952, p. 1712. The basic policy of the Act strongly supports careful guardianship of the rights of aliens to be given a "reasonable opportunity" under all the circumstances to attend their hearing, and to be represented by counsel of their choice (though not at government expense). Its spirit as well as its letter commands that an indigent alien with a facially legitimate claim to asylum in this country, who evidences no intent to obstruct proceedings, not be deprived of his ability to present his case because he and his counsel are unable to travel 3400 miles round-trip to a hearing, when, with a little give in the system, the

---

**3.** Indeed, Congress provided separately for the provision of notice, requiring the Attorney General to promulgate regulations providing "notice, reasonable under all the circumstances, of the nature of the charges against [the alien] and the time and place at which the proceedings will be held." 8 U.S.C.A. § 1252(b)(1) (1988).

hearing could be held at his residence.[4]

Second, petitioner was not only denied a reasonable opportunity to attend his hearing; he was also effectively denied his right to be represented by "such counsel as he shall choose," at that hearing.[5] *Cf. Castro–O'Ryan* (denial of statutory right to counsel found where proceedings conducted in Arizona although counsel of choice and alleged witnesses were in San Francisco); *Chlomos v. U.S. Department of Immigration and Naturalization,* 516 F.2d 310 (3d Cir.1975) (proceedings in Florida violated statute where hearing officer could have determined that alien had counsel in New Jersey). The immigration judge knew in this case that the local attorney of record, Mr. Hughes, was in El Salvador at the time of the hearing. It certainly did not satisfy Maldonado–Perez's statutory right to take judicial notice that "there is a lady attorney who has taken care of the office," Appendix ("App.") at 24. There was no indication in the record that this "lady attorney" was even aware of petitioner's existence much less that she was expected to appear at a hearing during Hughes' absence.[6] Moreover, it was plain to all concerned that Mr. Van Wyke in Washington, having been recently retained by the petitioner, was now representing the petitioner. There had been telephone contact between the INS attorney and Van Wyke and the transmittal letter with the motion for change of venue indicated that the notice of appearance as attorney form G–28 was enclosed, although apparently it was never recorded.

In the end there was *no one* at the hearing to represent petitioner. The consequences that flowed from proceeding *in absentia* and without benefit of counsel were dire: petitioner's asylum claim was dismissed outright because there was no one to make his case. While Maldonado–Perez's counsel can technically be scored for failing to make an earlier attempt to change venue, in fact he had only been hired a week before. At any rate, it is harsh to visit the substantial, possibly tragic, consequences of that error in timing by a *pro bono* attorney on petitioner.[7]

**4.** The majority's reliance on *Patel v. INS,* 803 F.2d 804 (5th Cir.1986) is misplaced. *Patel* was *not* an asylum case; there was no indication that the alien in that case, who had twice violated terms of his stay in the United States, was attempting to do anything *but* delay deportation. Patel did not claim to be unable to travel to his hearing; indeed it appears that the hearing was to be held near Patel's residence. Patel sought not a change of venue but rather a continuance merely because his counsel claimed to need more time to prepare and purportedly had a scheduling conflict, of which the court found no evidence. Patel gave no reasons for failing to appear himself. These unique facts clearly meet the congressional objective of allowing *in absentia* hearings as a means to "punish aliens who fail to appear" at their hearing for no good reason. H.R.Rep. No. 1365, *supra,* at 57, U.S. Code Cong. & Admin.News 1952, pp. 1712–1713.

**5.** 8 U.S.C.A. § 1362 (1970) provides:

**Right to counsel:** In any exclusion or deportation proceedings before a[n] [immigration judge] and in any appeal proceedings before the Attorney General from any such exclusion or deportation proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

"The legislative history of this provision confirms that Congress wanted to confer a *right.*"

*Castro–O'Ryan v. U.S. Department of Immigration and Naturalization,* 847 F.2d 1307, 1312 (9th Cir.1988).

**6.** The majority is "perplexed" as to why one of the three attorneys did not appear at the hearing. Maj. op. at 333. The record, however, shows one was out of the country; his alleged "replacement," likely knew nothing of the case, for both were of the (correct) view that the case had been taken over by attorney Van Wyke in Washington. For his part, Van Wyke expected that the motion to change venue, which he had reason to believe was unopposed by the government, would be granted but, more to the point, as *pro bono* counsel he was unable to shoulder the expense of a round-trip to San Antonio. It cannot be ignored that a primary basis for the venue motion was lack of funds to make such a trip.

**7.** As emphasized previously, there is absolutely no evidence that petitioner was engaging in any type of dilatory behavior that characterizes those cases in which courts have upheld use of the *in absentia* sanction. *See Patel, supra* n. 4; *Shah v. INS,* 788 F.2d 970 (4th Cir.1986); *United States v. Dekermenjian,* 508 F.2d 812 (9th Cir. 1974). *Compare Baires, supra; Castro–O'Ryan, supra; Chlomos, supra.* There can therefore be no concern that the fair result in this case would diminish the power of the *in absentia* sanction to deter contumacy.

Thus I would find in the peculiar circumstances of this case that it was an abuse of discretion to deny the final change of venue motion. I would also find that it was an abuse of discretion to deny petitioner a continuance once the second motion for change of venue had been denied. While no written motion for a continuance was made, the transcript of the hearing indicates that the INS trial attorney stated that petitioner "would be seeking a continuance." App. 23. The trial attorney's notes for the day also indicate that the "I.J. [Immigration Judge] was notified by T.A. [trial attorney] as to atty Van Wyke's request for continuance and c/v [change of venue]," and that the immigration judge "denied respondent's [Maldonado–Perez's] request for continuance." The immigration judge himself apparently believed that he had been asked to rule on a continuance or else why did he discuss at some length his rationale for granting or denying continuances? *See* App. 23–24.

The consequences attendant upon the denial of the motion to change venue were severe. These consequences should properly have entered into the decision of whether or not to continue the case. Additionally, "in deciding whether denial of the alien's request [for either venue change or continuance] would violate his statutory right to a reasonable opportunity to present evidence in his own behalf, the judge must consider the nature of the evidence to be presented and its importance to the alien's claim." *Baires, supra,* at 92. No consideration of that factor either appears to have taken place here. Moreover, as judicial officers bound to protect the statutory and constitutional due process rights of these disadvantaged aliens, it would seem that the immigration judge could be held to the minimal burden of at least inquiring of attorney Van Wyke how he wished to proceed after denial of the venue change or of postponing the asylum-deportation hearing for a few days until contact with Van Wyke was made; alternatively, the "lady attorney" the judge deemed to be standing in as local counsel could have been contacted; the INS trial attorney, who must have been aware of the

seriousness of the situation, having spoken twice on the phone to Van Wyke (leaving the impression with Van Wyke that he was supportive of the motion to change venue), might be expected to call Van Wyke after the motion for venue was denied. *Cf. Chlomos, supra,* at 313 ("A telephone call by the hearing officer or the government trial attorney would have revealed the fact that a lawyer had entered his appearance for Chlomos."). Yet none of these simple measures were taken to afford Maldonado–Perez his "reasonable opportunity" to attend or be represented at the hearing. For want of a phone call, the deportation proceeded *in absentia.*

This case, with its intricate fact pattern, ultimately turns on notions of fundamental fairness toward the stream of not-always-welcome refugees fleeing from South of the Border to the promises of "El Norde." The government acknowledgedly has legitimate interests in preventing the obstruction of its administrative procedures by their inevitable movement around the country. But where there is no evidence that obstruction is afoot and where the INS' interest in a particular venue reflects only standard concerns about minor delays, it runs counter to the statutory purpose and to fundamental fairness to deny an alien the opportunity to present a facially legitimate claim to asylum. This was in my view such a case. Maldonado–Perez could not appear in person; his *pro bono* counsel tried by imperfect means to get a change of venue or a continuance. The burden to the court or the INS of providing either was minimal; without either this petitioner had no "reasonable opportunity" to appear or be represented. I therefore dissent from upholding the decision *in absentia* to dismiss his asylum claim and deport him.